# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

## MAY 1998 SESSION



FILED

July 14, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | |
|---|---|
| **STATE OF TENNESSEE,** | ) |
| | ) C.C.A. No. 02C01-9707-CR-00246 |
| Appellee, | ) |
| | ) Shelby County |
| V. | ) |
| | ) Honorable Chris Craft, Judge |
| **JOHN ADAMS and** | ) |
| **RITA ADAMS,** | ) (Aggravated Child Abuse) |
| | ) |
| Appellants. | ) |

FOR THE APPELLANT:

<u>John Adams</u>
Michael E. Scholl
Attorney at Law
200 Jefferson Avenue, Suite 202
Memphis, TN 3803

<u>Rita Adams</u>
A C Wharton, Jr.
Shelby County Public Defender

Walker Gwinn
Assistant Public Defender
201 Poplar Avenue, Suite 201
Memphis, TN 38103

FOR THE APPELLEE:

John Knox Walkup
Attorney General & Reporter

Peter M. Coughlan
Assistant Attorney General
425 Fifth Avenue North
2d Floor, Cordell Hull Building
Nashville, TN 37243-0493

William L. Gibbons
District Attorney General

Amy P. Weirich
Assistant District Attorney General
201 Poplar Avenue, Suite 301
Memphis, TN 38103

OPINION FILED: _____

**AFFIRMED**

**PAUL G. SUMMERS,**
Judge

**O P I N I O N**

The appellants, John and Rita Adams, were convicted by a jury of aggravated child abuse through neglect in the Shelby County Criminal Court. Rita Adams was also convicted of assault. The appellants were sentenced to twenty years in the Department of Correction. They have appealed. We affirm all convictions and sentences.

The victim, Dillon Adams, was born on November 28, 1994. His mother, Rita Adams, was addicted to codeine. She took methadone daily to treat her addiction. She took methadone during her pregnancy. At birth, Dillon suffered from respiratory distress syndrome. He stayed in the hospital several days so that the fluid in his lungs could be cleared. Dillon was born addicted to methadone. Fortunately, he did not suffer from any side effects except irritability. On December 5, 1994, Dillon was well, and he went home with the appellants.

On December 24, 1994, John Adams called 911 and reported that Dillon had stopped breathing. Adams testified that when he fed Dillon, formula came out of his nose and mouth. He testified that Dillon's lips were blue and his body was limp. Adams shook Dillon in an attempt to resuscitate him. He also administered CPR. Adams testified that he told Rita Adams to call 911, but she refused, saying she could not handle it. Paramedics transported Dillon to LeBonheur Children's Medical Center where he was placed on life support. Dillon was listed in extremely critical condition. A ventilator was inserted in his windpipe to assist in respiration. Tests revealed that Dillon had multiple severe injuries that had been left untreated. The baby was less than a month old when the injuries occurred.

Dillon was primarily treated by three physicians, all of whom testified at trial. Dr. Thomas Boulden, a pediatric radiologist, testified that Dillon's CAT

-2-

scans showed two distinct injuries. Dr. Boulden testified that Dillon had a fractured skull caused by a direct blow. Dr. Boulden testified that Dillon also had brain damage. There was bleeding and swelling in the front and back of Dillon's brain. Part of his brain had actually dissolved. Dr. Boulden testified that Dillon's injuries were consistent with "shaken baby syndrome." The brain damage was caused by shaking the child such that the brain repeatedly hit the cranial wall. As a result of the injury, Dillon has a permanent empty space in his skull where fluid gathers. Flexible tubing known as a subdural shunt was inserted in Dillon's skull to drain built-up fluid in his brain. The tubing runs underneath Dillon's skin down to the abdominal cavity where it drains. The skull fracture was several days old. The brain damage was approximately twenty-four hours old. Dr. Boulden testified that the skull and brain injuries were the result of child abuse.

Dr. Robert Kaufman, also a pediatric radiologist, testified that Dillon had nine fractures in addition to his skull and brain injuries. Dr. Kaufman testified that the shaft to Dillon's right femur or thigh bone was split apart by considerable force four to seven days before he was brought to the emergency room. The same area was re-fractured after it had begun to heal. As a result, Dillon's right leg was swollen when he arrived at the hospital. Dillon also had fractures to the edge and end of the bone. Dr. Kaufman testified that Dillon had fractures at the end of the left femur, the end of the right tibia, and the end of the left tibia. Dr. Kaufman explained that the fractures to the end of the bone, metaphyseal fractures, were indicative of child abuse. He explained that metaphyseal fractures go across the entire bone and were usually caused by a violent twisting motion and not a fall. The metaphyseal fractures were approximately two weeks old. Two of the vertebrae in Dillon's spine were fractured. Dillon also had a fracture to his ninth rib which occurred approximately four to five days prior to arriving at the emergency room. There is evidence in the record that Dillon had

a broken collarbone. Dr. Kaufman testified that the skeletal findings were entirely consistent with child abuse. He further testified that none of the injuries were consistent with birth trauma.

Dr. Gregory Stidham, a pediatric care specialist, was Dillon's critical care specialist. Dr. Stidham testified that Dillon's condition was extremely critical when he arrived at the emergency room. Dillon would have died without the medical treatment. Dr. Stidham testified that, in addition to Dillon's other injuries, he was emaciated, had burn marks on his hand and foot, and was lethargic to the point of becoming comatose. Dr. Stidham's opinion was that Dillon had been intentionally injured. He testified that Dillon's brain injury was caused by violent shaking, that the fracture to his thigh could not have happened by accident, and that the burn on his foot was suggestive of a cigarette burn. Photographs of the burns and Dillon's broken leg were admitted into evidence.

Both appellants testified. John Adams testified that he worked during the day, and Rita was the primary care giver of Dillon. The appellants had a one-year-old child, and Rita had a fourteen-year-old son who lived with them. John Adams testified that he asked Rita about Dillon's physical condition on numerous occasions, but never received a straight answer. John Adams denied abusing or neglecting Dillon.

Rita Adams testified that she never abused Dillon. She testified that she was unaware of most of his injuries. She stated that a week before Dillon went to the hospital, his right leg was larger than his left leg and was clinched up all the time. She did not seek medical attention because she assumed that it was a "lazy leg or whatever." Despite her daily presence, she denies abusing or witnessing anyone commit abuse on Dillon. She testified that she thought that Dillon burned himself on the coffee pot while she was bathing him. She testified

that she thought that Dillon's foot was burned when John fell asleep and dropped a cigarette on the baby. Rita further testified that since Dillon cried all the time she did not think that anything unusual was wrong with him when he cried.

Rita's brother, John Smith, now takes care of Dillon. He testified that Dillon still has the shunt in his head and that you can see the tube running down his neck into his stomach. Dillon's right eye does not move normally with his left eye, and, he is mentally slower than other children his age.

The appellants challenge the sufficiency of the evidence. In a sufficiency of the evidence challenge, the relevant question on appellate review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or crimes beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); T.R.A.P. 13(e); State v. Duncan, 698 S.W.2d 63 (Tenn. 1985).

In Tennessee, great weight is given to the result reached by the jury in a criminal trial. A jury verdict accredits the testimony of the state's witnesses and resolves all conflicts in favor of the state. State v. Williams, 657 S.W.2d 405 (Tenn. 1983). Moreover, a guilty verdict replaces the presumption of innocence enjoyed at trial with the presumption of guilt on appeal. State v. Grace, 493 S.W.2d 474 (Tenn. 1973). The appellant has the burden of overcoming the presumption of guilt. Id. On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832 (Tenn. 1978).

As applicable to this case, aggravated child abuse occurs when a person commits the offense of child abuse as defined in Tennessee Code Annotated

section 39-15-401 (Supp. 1994) and the act results in serious bodily injury to the child. Tenn. Code. Ann. § 39-15-402(a)(1) (Supp. 1994). Child abuse occurs when a person, other than by accidental means, knowingly treats a child in such a manner as to inflict injury or neglects a child so as to adversely affect the child's health and welfare. Tenn. Code Ann. § 39-15-401(a). Serious bodily injury is bodily injury that involves: (A) a substantial risk of death; (B) protracted unconsciousness; (C) extreme physical pain; (D) protracted or obvious disfigurement; or (E) protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. Tenn. Code Ann. § 39-11-106(a)(33) (1991). If the victim of the aggravated child abuse is less than six years of age, then the offense is a class A felony. Tenn. Code. Ann. § 39-15-402(b).

Rita Adams argues that the evidence of serious bodily injury is insufficient to sustain her conviction. She argues that the evidence of serious injury is entirely circumstantial and does not exclude every reasonable cause of injury. These arguments are without merit. The expert medical evidence of multiple and severe injuries is absolutely overwhelming. While in jail, Rita wrote several letters to her brother John Smith. She stated that she was not guilty of abuse, but maybe neglect. She stated that she knew that she had neglected Dillon. She stated that Dillon accidentally burned his hand on the stove and that she should have taken him to the doctor. She stated that Dillon fell out of her bed onto the "hard" floor a week before Dillon was taken to the hospital. She stated that John shook Dillon "hard" to get him to breathe on the night that Dillon went to the hospital. She asked her brother to get John out of jail because he did not need to be in jail for the things that she had done. She stated that she was guilty of doing these "crazy" things to Dillon. She stated that she caused this "whole big tragedy."

In the letters, Rita Adams stated that she was depressed and lonely

before and after her pregnancy with Dillon. She said that she was not herself and that she no longer cleaned house or took care of herself. She stated that something just snapped in her head. She states that she could not handle three children. She said that she never intentionally hurt Dillon, and that she did not know that "something bad had happened to Dillon." She stated that she did not know about many of his injuries. The evidence is sufficient to sustain Rita Adams' conviction for aggravated child abuse.

John Adams argues that the state failed to establish the requisite mens rea of "knowingly" for the offense of aggravated child abuse. A person commits a crime knowingly when that person is aware that his or her conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-10-302(b) (1989). John Adams argues that he worked long hours, questioned Rita about Dillon's injuries, treated the injuries that he recognized, and was aware of a scheduled doctor's visit for Dillon. He further argues that none of the baby's injuries, except the burns, were recognizable to a lay person.

Shortly after Dillon was admitted to the hospital, John Adams gave a statement to the police. The statement was introduced into evidence. John Adams stated that he knew that Dillon had burns, a bruise to his back, and a swollen leg. He knew that Dillon was not eating properly and that he slept all day. He knew that Rita might have been giving the baby "mini-thins." He knew that Rita was having trouble caring for Dillon. He knew that Rita would not take Dillon to the doctor. He knew that something was wrong with Dillon before he and Rita went to Wal-Mart to shop on the night that Dillon was rushed to the hospital. John noticed the burn on Dillon's hand a week before Dillon was admitted to the hospital. He stated that it looked like Rita had placed a cigarette between Dillon's fingers and watched it burn because the burn was so deep. He stated that the burn was three or four layers deep and would scar Dillon for life.

Apparently, he did not take Dillon to the doctor because Rita was treating it with antiseptic. He also stated that he noticed a bruise on Dillon's back and saw Dillon's eyes rolling back in his head. John stated that "[e]very time I picked him up, he'd holler like something was hurting him. I couldn't touch him to change him. Every time I would pick up his leg to change him, he would scream like bloody murder, and Rita would say 'stick a bottle in his mouth and he will stop crying.' But I kept noticing these things wrong with him." He stated that Rita would hold Dillon's tongue down to keep him from crying. The evidence is sufficient to support the jury's conviction. John Adams knew that something was wrong with Dillon, he was capable of taking Dillon to the doctor, he did not do so, and this neglect resulted in serious injury. Rita Adams was the primary care giver, but this does not absolve John, as the father of Dillon, from responsibility for Dillon's welfare, especially when he knew that Rita would not take the baby to the doctor.

Rita Adams argues that the crime of aggravated child abuse through neglect does not exist in Tennessee. She argues that since the aggravated child abuse statute provides that the "act of abuse" results in serious bodily injury, aggravated child abuse cannot occur through neglect because neglect is an omission, not an action. The state contends that this argument ignores the language of the aggravated child abuse statute which clearly reflects the legislature's intent to create the crime of aggravated child abuse through neglect. The state says the definition of child abuse clearly includes neglect, and the aggravated child abuse statute incorporates this definition by reference.

When interpreting or construing the meaning of a statute, we must ascertain and give effect to the intent of the legislature. State v. Chance, 952 S.W.2d 848, 849 (Tenn. Crim. App. 1997). When possible, we look to the ordinary meaning of the language used. State v. Harris, 953 S.W.2d 701, 704-

05 (Tenn. Crim. App. 1996). We presume that the legislature does not intend absurd results. Chance, 952 S.W.2d at 849. We will avoid such a result if the terms of the statute can be reasonably construed to do so. Id. We conclude that the legislature fully intended for aggravated child abuse to include child abuse through neglect that results in serious injury. The language of the statute supports such an interpretation. We appreciate the appellant's argument; however, her interpretation of the statute produces an absurd result. For example, a parent who pushes his or her baby into a fire would be guilty of aggravated child abuse. A parent whose child fell into a fire would not be guilty of aggravated child abuse if the parent let the child burn. This would be absurd.

John Adams argues that the trial court erred in allowing the state to introduce his statement but omitted that he told the police that he was willing to take a polygraph test. In Tennessee, "[i]t has long been established that the results of a polygraph examination are not admissible as evidence in a criminal prosecution." State v. Campbell, 904 S.W.2d 608, 624-15 (Tenn. Crim. App. 1995). The fact that an accused either offered to take, took, or refused to take a polygraph examination cannot be admitted as evidence. Id. at 615. This issue is without merit.

John Adams also argues that the trial court erred in excluding the testimony of his former attorney. In his statement to the police, John stated that he had never shaken the baby. At trial, however, John testified when Dillon stopped breathing on December 24, he shook the baby in an effort to revive him. The state made an issue out of John's failure to include this fact in his statement. After giving the statement, John Adams told his lawyer that his statement was not completely correct. Adams wanted his attorney to testify that he, Adams, had admitted that his statement was not complete. Adams claimed that his attorney's testimony fell under the state of mind exception to the hearsay rule.

The state contended and contends on appeal that the statement is inadmissable hearsay. The trial court found that the state of mind exception did not apply because John Adam's statement to his attorney concerned an event that happened weeks or months after Adams gave his statement to the police. The court concluded that John's statement was not relevant to John's state of mind at the time he spoke to the authorities. Rulings on the introduction of evidence are usually within the discretion of the trial judge and will not be reversed except for an abuse of that discretion. State v. Campbell, 904 S.W.2d 608, 616 (Tenn. Crim. App. 1995); State v. Baker, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989). We find no abuse of discretion. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Tenn. R. Evid. 801(c). Rule 803(3) of the Rules of Evidence establishes the state of mind exception to the hearsay rule. The exception applies to:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed.

We find no abuse of discretion. John Adams' statement is a statement of his belief offered to prove what he believed at the time he talked to his attorney. It is not a statement that establishes his state of mind at the time he gave a statement to the authorities.

John Adams argues that the trial court erred in refusing to instruct the jury on the defense of necessity on the second count of the indictment, aggravated child abuse through neglect. The defense of necessity requires that the person reasonably believe the conduct is immediately necessary to avoid imminent harm and that the desirability and urgency of avoiding the harm clearly outweigh,

according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct. Tenn. Code Ann. § 39-11-609 (1989). Essentially, the appellant argues that, given his work schedule, he did all he could for Dillon. However, each morning both John and Rita went to the methadone clinic. The record establishes that John Adams had many opportunities to take Dillon to the doctor. The trial court denied the appellant's request for the instruction because there was no proof that the appellant neglected the child to prevent harm to the child or someone else. The judge is not required to charge the jury on an issue that is not fairly raised by the proof. State v. Stephenson, 878 S.W.2d 530, 550 (Tenn. 1994). The defense of necessity with regard to neglect is not raised by the proof. This issue is without merit.

Both appellants claim that their sentences are excessive. When a defendant challenges the length, range, or manner of service of his sentence, we conduct a de novo review on the record with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (1990). Where the trial court fails to follow the statutory guidelines, however, the presumption of correctness no longer applies and our review is completely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). In conducting our review we consider: (1) the evidence received at the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments concerning sentencing alternatives; (4) the characteristics and nature of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and statutory enhancement factors; (6) any statement the defendant wishes to make in his or her own behalf about sentencing; and (7) the defendant's potential for rehabilitation. Tenn. Code Ann. § 40-35-210(b) (1990); State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991).

The presumptive sentence shall be the minimum sentence in the range if no enhancement or mitigating factors exist. Tenn. Code Ann. § 40-35-210(c) (1990). If enhancement factors exist but there are no mitigating factors, then the trial court may set the sentence above the minimum in that range but still within the range. Should both enhancement and mitigating factors exist, the court must start at the minimum sentence in the range and enhance the sentence within the range as appropriate for the enhancement factors. The trial judge shall then reduce the sentence within the range as appropriate for the mitigating factors. Tenn. Code Ann. § 40-35-210(d), (e) (1990).

In determining Rita Adams' sentence, the court found four applicable enhancement factors: 1) she was a leader in the commission of an offense, 2) the child was particularly vulnerable because he was less than a month old when the injuries occurred, 3) the victim suffered permanent impairment as a result of the abuse, and 4) the lack of immediate medical care probably would have resulted in the death of the victim. Tenn. Code Ann. § 40-35-114 (2)(4)(18) & (19) (Supp. 1994).

In determining John Adams' sentence, the court found several applicable enhancement factors: (1) the appellant has a history of criminal convictions, (2) the victim was particularly vulnerable because of age, (3) the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release into the community, (4) the victim suffered permanent injury, and (5) the lack of immediate medical treatment would have probably resulted in death. Tenn. Code Ann. §§ 40-35-114 (1)(8)(18) & (19) (Supp. 1994).

The appellants argue that the trial court erred in enhancing their sentences based on vulnerability due to age because age is an element of aggravated child abuse through neglect. If the victim of child abuse is less than

six years old, then the offense of aggravated child abuse is a class A felony. Our Supreme Court has held that the vulnerability factor may be applied to enhance a sentence for an offense of which age is an element. State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993). In Adams, the Court said that the relevant inquiry is not whether the victim is under a particular age, but "whether the victim was particularly vulnerable because of age. . . ." Id. at 35 (emphasis in the original). The Court stated that the vulnerability enhancement factor relates more to the natural physical and mental limitations of the victim than merely to the victim's age. Id. Clearly, the victim in this case was particularly vulnerable because of his physical and mental limitations. The court found, and the evidence establishes, that Dillon could not resist the crime, summon help, or testify at a later date. The one-month-old baby was totally dependant on the appellants for his care. We find no error with the court's application of this factor to enhance the appellants' sentences.

Rita Adams also argues that she was not the leader in the commission of an offense because there is no leader to an offense based on inaction. We find no merit to this contention. Rita was Dillon's primary care giver. She further argues that the court should have considered her post-partum depression and emotional strain as a mitigating circumstance, as well as the fact that she had never been arrested or convicted of anything. We find no error with the court's finding of no mitigating evidence. Rita Adams could have sought medical help for depression. Furthermore, the court would have been justified in rejecting her testimony as to depression based on a finding of a lack of credibility. Her lack of prior convictions is reflected in her Range I, standard offender status.

John Adams argues that the court should not have relied on his convictions because the convictions are very old. From the record it appears that John Adams does not have a significant history of criminal convictions, but it

-13-

does indicate criminal activity. The other enhancement factors are more than sufficient to support a twenty-year sentence in this case. John further argues that there was no evidence that the baby suffered permanent injuries. We disagree. Dr. Boulden testified that part of Dillon's brain actually dissolved as a result of injuries. John Adams also argues that facts relied upon to make the crime aggravated are the same facts relied upon to find that the appellant treated the baby with exceptional cruelty. The court did not apply this factor because it found that it was an element of the offense. John Adams argues that the court should consider as a mitigating factor that he assisted the police by giving them a statement. We find no merit to this argument. The appellants' sentences are affirmed.

Finally, the appellants argue that the trial court should have required the state to "elect" which injuries were caused by the appellants' neglect. In Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973), the Tennessee Supreme Court held that it is the duty of the trial judge to require the state, at the close of it proof-in-chief, to make an election of the particular offense it will rely on for conviction and to properly instruct the jury so that the verdict of every juror would be united on the one offense. Burlison involved various allegations of sexual misconduct. The reasons for requiring election in cases that contain evidence of numerous instances of unlawful conduct is to enable the defendant to prepare for and make his defense to the specific charge; to protect him from double jeopardy by individualization of the issue; and to insure that the jury's verdict may not be a matter of choice between offenses, some jurors convicting on one offense and others, another. Id. at 803.

The appellants had sufficient information to prepare their defense and double jeopardy is not an issue. The appellants' primary concern is that the jury's verdict was not unanimous because the members were not required to

specify which serious injury was caused by the appellants' neglect. The state argues, and the trial court found, that an election of offenses was unnecessary because the offense is one continuous period of neglect. We agree. Indeed, if the state had indicted the appellants on thirteen counts of aggravated child abuse through neglect based on the injuries in this case, the appellants would most likely be arguing that neglect was one continuous offense.

The judgments of the trial court are affirmed in all respects.

_____

PAUL G. SUMMERS, Judge

CONCUR:

_____

JOHN H. PEAY, Judge

_____

THOMAS T. WOODALL, Judge